2009 UT App 90

Seadhna J. FLORES, Plaintiff
and Appellee,

v.

David G. EARNSHAW, Defendant
and Appellant.

No. 20080102–CA.

Court of Appeals of Utah.

April 9, 2009.

Donald L. Dalton, Salt Lake City, for Appellant.

Michael F. Olmstead, Ogden, for Appellee.

Before Judges GREENWOOD, McHUGH, and BILLINGS.[1]

## OPINION

GREENWOOD, Presiding Judge:

¶ 1 David G. Earnshaw appeals the trial court's interpretation of a real estate purchase contract (the REPC) through which Earnshaw purported to sell a yet-to-be-built

---

1. The Honorable Judith M. Billings, Senior Judge, sat by special assignment pursuant to Utah Code section 78A–3–103(2) (2008), and rule 11–201(6) of the Utah Rules of Judicial Administration.

condominium unit to Seadhna J. Flores.[2] In particular, Earnshaw alleges that the trial court erred in determining that the REPC was ambiguous with respect to whether the parties intended for the unit to be sold as fully built out. We reverse and remand.

## BACKGROUND

¶2 In anticipation of approval for "the construction of the Earnshaw Building, a six-story building, consisting of offices on the main floor and residential condominium units on the remaining floors," Earnshaw advertised the sale of the residential condominium units online and at the prospective building site. Flores expressed interest in purchasing a condominium unit in December 2005. Following negotiations, Earnshaw offered to sell a condominium unit to Flores.

¶3 In early January 2006, Earnshaw faxed an option agreement to Flores offering to sell unit no. 402 for $144,950.[3] Flores signed the option agreement and returned it to Earnshaw along with the $10,000 necessary to exercise the option, money that would ultimately be applied toward the purchase price of the unit. In early April 2006, Earnshaw sent Flores the REPC at issue, which Flores and Earnshaw both subsequently signed. Under this REPC, Flores was to purchase unit no. 402 for "$144,950, less the $10,000 previously paid when Flores had exercised the earlier Option Agreement."

¶4 Despite the fact that the REPC was "a fully integrated and binding agreement," Earnshaw called Flores in early May to express concern over the selling price of unit no. 402. In an effort to correct and adjust the purchase price, Earnshaw faxed an addendum to the REPC to Flores, which stated:

> The total selling price referenced on the REPC for the sum of $144,950.00 *was made in error.* All other units of the like

were sold for the price of $184,950.00. Therefore, it becomes necessary to adjust the selling price for [unit no. 402].

In light of this error, the addendum gave Flores a $5000 discount off the newly elevated price, stating that the purchase price of unit no. 402 would be $179,950, less the $10,000 deposit to be applied at closing. Flores was allowed twelve days to accept the addendum or forfeit his $10,000 deposit, at which time Earnshaw would consider their agreement void. Flores declined.

¶5 Subsequently, Flores initiated the present action for specific performance and breach of contract. A bench trial was conducted on September 21, 2007. At trial, Flores contended that he and Earnshaw negotiated the price for the unit and that Earnshaw was well aware of Flores's price constraints. Flores also referred to the REPC and argued that it obligated Earnshaw to provide a fully built-out unit to Flores for the purchase price of $144,950. Earnshaw, on the contrary, testified that he always intended to sell Flores a fully built-out unit but that he had intended to do it for the price of $184,950. Earnshaw further testified that the parties had always intended for the purchase price to be $184,950 but that either he had mistakenly written $144,950 or, alternatively, that his secretary had transferred the purchase price inaccurately from Earnshaw's notes to the option agreement. In addition, Earnshaw presented evidence that all similarly sized units had been sold at the higher price and that he would be unable to realize a profit if he were to sell unit no. 402 for only $144,950. Finally, Earnshaw referred to the language of clause 1.1 of the REPC and argued that it explicitly provides for the sale of a "shell" unit, not for a fully built-out unit. Clause 1.1 states, in its entirety:

> *Included Items.* Unless excluded herein, this sale includes the following items *if presently owned and attached to the Prop-*

2. We begin by noting that the difficulties in this case arise largely because, as the trial court pointed out, "Earnshaw used a REPC that is normally used in the sale and purchase of an *existing* piece of improved real estate," even though he was attempting to sell a condominium unit that was not yet built at the time the contract was executed. We highlight this fact to caution against the use of standard form con-

tracts that are not appropriate for the transaction at hand.

3. The option agreement preceded the REPC "because, as of January 2006, Earnshaw had not yet finalized his purchase of the real estate from Ogden City on which to build his building."

*erty:* plumbing, heating, air conditioning fixtures and equipment; ceiling fans; water heater; built-in appliances; light fixtures and bulbs; bathroom fixtures; curtains, draperies and rods; window and door screens; storm doors and windows; window blinds; awnings; installed television antenna; satellite dishes and system; permanently affixed carpets; automatic garage door opener and accompanying transmitter(s); fencing; and trees and shrubs.

(Second emphasis added.)

¶ 6 The trial court agreed largely with Flores, concluding that the REPC was clear and unambiguous as to the price of $144,950. However, the trial court ruled that the REPC was ambiguous as to whether the parties intended convey a fully built-out unit or just a shell of a unit. More specifically, the trial court determined that because the REPC was a form contract generally used for the sale of existing residences, clause 1.1 of the REPC "creates an uncertain meaning of the parties' intent, a facial deficiency, and an impression that terms are missing" as it relates to the sale of then-unbuilt unit no. 402. The trial court accordingly allowed presentation of parol evidence to determine the parties' intent regarding this issue. After noting that both Flores and Earnshaw agreed that they intended for the sale to be for a fully built-out unit, the trial court ruled that such was the parties' intent at the time of contracting. Thus, the trial court ordered Earnshaw to sell a fully built-out unit no. 402 to Flores for the purchase price of $144,950. This appeal followed.

## ISSUE AND STANDARD OF REVIEW

¶ 7 The sole issue on appeal is whether the trial court erred in determining that the REPC is ambiguous and in allowing parol evidence to interpret clause 1.1. Whether a contractual term or provision is ambiguous on its face is a question of law. *See Daines v. Vincent,* 2008 UT 51, ¶ 25, 190 P.3d 1269. Once the court determines that the term or provision is facially ambiguous, it may determine the parties' intent through examination of parol evidence, the determination of which presents a question of fact.

*See id.* ¶¶ 25–26. "In reviewing a trial court's contract interpretation, we defer to the trial court on questions of fact but not on questions of law." *Peterson v. Sunrider Corp.,* 2002 UT 43, ¶ 14, 48 P.3d 918.

## ANALYSIS

¶ 8 We begin our analysis by determining whether the trial court was correct in concluding that clause 1.1 of the REPC is ambiguous. The Utah Supreme Court most recently addressed this subject in *Café Rio, Inc. v. Larkin–Gifford–Overton, LLC,* 2009 UT 6, 622 Utah Adv. Rep. 31. In *Café Rio,* there was a dispute among the owners of six contiguous parcels of property in a commercial development regarding the meaning of two contracts. *See id.* ¶ 1 n. 1. The trial court held that the contracts were not ambiguous and prohibited Larkin–Gifford–Overton (LGO) from constructing a building on property it owned that was subject to cross-easements. *See id.* ¶ 17. On appeal, the supreme court set forth the guiding principles for contract interpretation, including how to determine if ambiguity exists in a contract and when parol evidence of intent may be considered. *See id.* ¶ 25. The court stated:

> Under well-accepted rules of contract interpretation, we look to the language of the contract to determine its meaning and the intent of the contracting parties. We also consider each contract provision . . . in relation to all of the others, with a view toward giving effect to all and ignoring none. Where the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law. Only if the language of the contract is ambiguous will we consider extrinsic evidence of the parties' intent. We have explained that ambiguity exists in a contract term or provision if it is capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies.

*Id.* (omission in original) (citations and internal quotation marks omitted). The contract at issue in *Café Rio* defined common areas as

"expressly excluding all buildings (and any building(s) constructed on [LGO's parcels] in the future)." *Id.* ¶ 27. The supreme court concluded that this language was not ambiguous and LGO, therefore, had a right to construct a building on its parcel upon otherwise-common area. *See id.* ¶ 28.

¶ 9 *Café Rio* was preceded by *Daines v. Vincent*, 2008 UT 51, 190 P.3d 1269, where the supreme court addressed the meaning of a release agreement, releasing a limited liability company "or any of its members" from liability in exchange for payment of $50,000. *See id.* ¶¶ 12–15. The *Daines* court stated that it wanted to address misunderstandings that may have resulted from its opinion in *Ward v. Intermountain Farmers Association*, 907 P.2d 264 (Utah 1995). *See id.* ¶ 24. The court identified two contexts in which contractual ambiguity may occur: "(1) facial ambiguity with regard to the language of the contract and (2) ambiguity with regard to the intent of the contracting parties."[4] *Id.* ¶ 25 (citing *Ward*, 907 P.2d at 268). Clarifying, the supreme court stated: "The first context presents a question of law to be determined by the judge. The second context presents a question of fact where, if the judge determines that the contract is facially ambiguous, parol evidence of the parties' intentions should be admitted." *Id.* (citations and internal quotation marks omitted). The court further explained that "before permitting recourse to parol evidence, a court must make a determination of facial ambiguity." *Id.*

¶ 10 In addressing facial ambiguity, the *Daines* court noted that in *Ward*, it "did not intend that a judge allow surrounding circumstances to create ambiguity where the language of a contract would not otherwise permit." *Id.* ¶ 27. In other words, extrinsic evidence proffered to show the existence of ambiguity would not trump "the language of the contract." *Id.* Thus, a finding of facial ambiguity sufficient to justify consideration of extrinsic evidence of the parties' intentions is appropriate only when the alleged facial ambiguity is " 'reasonably supported by the

language of the contract.' " *Id.* (quoting *Ward*, 907 P.2d at 268). Applying these principles, the *Daines* court concluded the contract before them was, as a matter of law, unambiguous. *See id.* ¶ 37. Thus, there was no "need to resort to the admission of parol evidence on the question of intent, because absent a finding of facial ambiguity, the parties' intentions must be determined solely from the language of the contract." *Id.* (internal quotation marks omitted); *see also Peterson*, 2002 UT 43, ¶ 19, 48 P.3d 918.

¶ 11 A closer look at *Ward* further illustrates the approach clarified in *Daines*. In *Ward*, a farmer had contracted with Intermountain Farmers Association (IFA) to spray his safflower field with a combination of herbicide and fertilizer. *See* 907 P.2d at 265. However, the sprayer used to spray his field had not been thoroughly cleaned and had earlier been used to spray an herbicide that could be deadly to safflower. *See id.* Following the death of much of his safflower crop, Ward sought damages from IFA. *See id.* Although hesitant at first, Ward entered into a release with IFA after receiving assurances from IFA that his future bean crop to be planted in the same field the following year would be unaffected. *See id.* at 266. The release stated that Ward would "release and hold harmless [IFA] for any and all damages caused by the spraying of [Ward's] nineteen acres of safflower." *Id.* at 265–66. When Ward's bean crop, planted in the same field the following year, began to die, IFA refused to compensate Ward for damages to the bean crop. *See id.* at 266. The *Ward* court considered extrinsic evidence allegedly demonstrating ambiguity and determined that the phrase "of safflower" was facially ambiguous because it was subject to two reasonable interpretations: "Although the phrase 'of safflower' could be read to simply define the field, it could also be construed to specify the damage subject to the release." *Id.* at 269. Only after finding the contract to be facially ambiguous did the *Ward* court then allow admission of parol evidence to determine which of these two possible inter-

---

4. Similarly, there may be ambiguity in a contract taken as a whole. *See WebBank v. American Gen. Annuity Serv. Corp.*, 2002 UT 88, ¶ 28, 54 P.3d 1139 (noting that there was ambiguity "as to the nature or character of the transaction as a whole"). That particular argument has not been made here.

pretations the parties actually intended. *See id.*

¶ 12 The message of these cases seems clear: A trial court may not consider parol evidence of intent without first finding ambiguity in the language of a contract. And, while relevant evidence proffered to demonstrate the alleged facial ambiguity must be considered, our analysis of such evidence is strictly limited to the determination of the existence of facial ambiguity and is "ultimately circumscribed by the language of the agreement." *See Daines,* 2008 UT 51, ¶ 28, 190 P.3d 1269. This rule applies even where the contract in question is poorly drafted. *See McEwan v. Mountain Land Support Corp.,* 2005 UT App 240, ¶ 25, 116 P.3d 955 (applying the above analysis even where the contract at issue "is not a model of clarity," further stating that such contractual confusion "do[es] not make [the contract] ambiguous"). The arguments in the case before us are limited to the meaning of the contractual language and, accordingly, we limit our analysis to those arguments.[5]

¶ 13 In the present case, the trial court determined that clause 1.1 of the REPC is ambiguous. Clause 1.1 addresses items included in the condominium unit to be sold and states, "Unless excluded herein, this sale includes the following items *if presently owned and attached to the Property:* plumbing, heating, air conditioning fixtures and equipment; [etc.]" (Emphasis added.) The trial court admitted uncontroverted parol evidence that at the time the REPC was executed by the parties there was no existing building; it was yet to be constructed. The trial court then used this evidence to determine the parties' intentions, without first addressing whether the evidence itself demonstrated a facial ambiguity " 'reasonably supported by the language of the contract.' " *Daines,* 2008 UT 51, ¶ 27, 190 P.3d 1269 (quoting *Ward,* 907 P.2d at 268). We believe the trial court's approach is contrary to the supreme court's direction in *Café Rio, Daines, Ward,* and other cases. Rather, the first step should be to determine if the REPC is facially ambigu-

ous, i.e., whether the contract language is "susceptible to contrary, tenable interpretations." *Id.* ¶ 30 (internal quotation marks omitted). Instead, the trial court here first admitted extrinsic evidence demonstrating the alleged ambiguity—notably, that the building was not yet constructed—and then, based on that evidence, determined the parties' intentions regarding clause 1.1. Although many Utah cases have stated that the parties' intent is paramount, admission of parol evidence to determine intent is allowed only if there is a "finding of facial ambiguity"; otherwise, "the parties' intentions must be determined solely from the language of the contract." *Id.* ¶ 37 (internal quotation marks omitted).

¶ 14 Having determined that the trial court erred by admitting parol evidence before addressing ambiguity in the language of clause 1.1, we turn to the issue of facial ambiguity. We hold that clause 1.1 is not ambiguous. Indeed, the parties did not offer differing versions of the language at issue. It is not seriously disputed that under clause 1.1 the enumerated items are included in the sale only if they were "presently owned and attached to the Property." There also does not appear to be a dispute that "presently" refers to the date of execution of the REPC. Finally, both parties agree that none of the items listed in clause 1.1 were "owned and attached to the Property" at the time the REPC was executed because the building was not yet constructed. Thus, paragraph 1.1 is not ambiguous and, as a matter of law, reflects the parties' intentions. In order to enforce the contract the trial court should not have relied on parol evidence to determine the parties' intent. Because there was no building existing at that time, none of the listed items were then "owned and attached to the Property" and none of them were included in the sale. We thus determine that, based on the plain language of the REPC, the parties intended for the sale to convey only a "shell" of unit no. 402 for the purchase price stated in the REPC.

**5.** The parties do not argue mutual mistake, reformation, impossibility, or any other theory to support their positions.

## CONCLUSION

¶ 15 In sum, we reverse the trial court's ultimate decision because we conclude that the trial court erred in determining that clause 1.1 of the REPC is facially ambiguous and, accordingly, in considering parol evidence to ascertain the parties' intent. We therefore remand this case to the trial court for further proceedings consistent with this opinion.

¶ 16 WE CONCUR: CAROLYN B. McHUGH, Judge and JUDITH M. BILLINGS, Senior Judge.